**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MICHAEL L. FORD,
     *Plaintiff*,

*v.*                     CASE NO. 2:13-CV-14478-LPZ-PTM

COMMISSIONER OF         DISTRICT JUDGE LAWRENCE P. ZATKOFF
SOCIAL SECURITY,        MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits and Supplemental Security

_____

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Income. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 13.)

Plaintiff Michael Ford was almost forty-two years old at the time of the most recent administrative hearing on May 1, 2012. (Transcript, Doc. 8 at 27, 121, 123.) Plaintiff worked full-time for twenty-five years in construction before his alleged disability onset. (Tr. at 149.) Plaintiff filed the present claims on February 3, 2011, alleging that he became unable to work on December 23, 2010. (Tr. at 121-28.) The claims were denied at the initial administrative stage. (Tr. at 42-45.) In denying Plaintiff's claims, the Commissioner considered fractures of lower limb and essential hypertension, and upon reconsideration also considered affective/mood disorders. (*Id.*) On May 1, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Andrew Sloss, who considered the application for benefits *de novo*. (Tr. at 27-41.) In a decision dated July 16, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 7-26.)

On September 25, 2013, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On October 25, 2013 Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1 at 1.)

**B.      Standard of Review**

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting under the authority and supervision of the Administration, usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482

U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through the Administration's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered *de novo* by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

### C.    The ALJ's Five-Step Sequential Analysis

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional capacity ("RFC") assessment, before a determination of not disabled is made, the Commissioner is "responsible for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Disability Insurance Benefits ("DIB"), provided for in Title II, 42 U.S.C. §§ 401-434, are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Supplemental Security Income ("SSI"), provided for in Title XVI, 42 U.S.C. §§ 1381-1385, is available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

4

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v.Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by" an impairment that precludes performance of past relevant work. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (cited with approval in *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)). If the analysis reaches step five, the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

### D.    The ALJ's Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at Step One that Plaintiff met the insured status requirements through September 31, 2015, and had not engaged in substantial gainful activity since December 23, 2010, the alleged onset date. (Tr. at 7-26.) At Step Two, he found that Plaintiff's conditions of "cellulitis in the right ankle, major depressive disorder, personality disorder[,] and polysubstance dependence" were "severe" within the meaning of 20 C.F.R. § 404.1520 and § 416.920. (Tr. at 12-13.) At Step Three, he found that Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalent of a listing in the regulations. (Tr. at 13-15.) At Step Four, he found that Plaintiff was unable to perform any past relevant work. (Tr. at 19.) He also found that Plaintiff was forty years old at the alleged onset date, putting him into the "younger individual" range of

eighteen to forty-four years old. (Tr. at 20.) At Step Five, he found that Plaintiff could perform sedentary work with several limitations including an unskilled limitation. (Tr. at 15.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 21.)

### E.   Administrative Record

### 1.   Medical History

On December 24, 2010, Plaintiff presented to Vanderbilt University Medical Center after a motor vehicle collision; among his injuries was an open right ankle fracture. (Tr. at 230-40.) Plaintiff was intoxicated upon arrival, and stated that his car ran off the road while he was driving. (*Id.*) An x-ray of Plaintiff's right leg showed a "[s]evere eversion injury with a comminuted lateral malleolar fracture, disruption of the ankle mortise, and dislocation of the tibiotalar joint[,] a [t]alar neck fracture," and a "[f]racture of the proximal fibular diaphysis." (Tr. at 237.)

Plaintiff's surgery the next day consisted of

1. Debridement and irrigation down to and including bone.
2. Open reduction and internal fixation of right lateral malleolus fracture.
3. Open reduction and internal fixation of right distal tibia Tilaux fracture.
4. Posterior tibial tendon repair.
5. Medial ankle deltoid ligament repair.
6. Physician directed fluoroscopy less than 1 hour.

(Tr. at 225-27.) After sterile dressings were applied, a "well-padded posterior splint with a stirrup" was added. (Tr. at 227.) Upon discharge, Plaintiff was to be non-weight bearing until an orthopedic follow-up in approximately two to three weeks, when the sutures were to be removed. (*Id.*)

On January 13, 2011, Plaintiff was evaluated in the orthopaedics clinic where "gross purulence" was observed at the sight of his surgery, and the "wound was smelly . . . ." (Tr. at 214.  Plaintiff admitted to fevers over the previous two days. (*Id.*) The next day, Plaintiff had

another surgery for "[p]ostoperative wound infection of open right ankle fracture." (Tr. at 216.) He presented with a "probable staphylococcus aureus infection involving the hardware in his right ankle and tibia." (Tr. at 215.) This time his surgery consisted of "(1) Debridement and irrigation of medial ankle wound down to including bone, which was 2x10cm. (2) Complex closure of wound. (3) Placement of incisional Wound VAC." (Tr. at 216.) Various antibiotics were ordered and it was anticipated that he would require six weeks of intravenous antibiotics and multiple follow-up treatments. (Tr. at 215.) On January 17, 2011, cultures showed MRSA and antibiotics were ordered. (Tr. at 210.) Plaintiff was advised by a physical therapist on "his appropriate weight bearing status and use of assistive devices." (*Id.*)

On January 27, 2011, Plaintiff was seen for a postoperative visit. (Tr. at 208-09.) When the dressing was removed from his wound there was "quite a bit of slough over the wound." (*Id.*) He had no sign of infection surrounding the incision and there was "a good granulation tissue base." (*Id.*) Dressings were placed on his wound and he was "placed back into a short-leg splint." (*Id.*) The sutures were "holding to the wound intact" and were left until the incision closed. (*Id.*) There was no sign of deep vein thrombosis. (*Id.*)

On February 10, 2011, Plaintiff was putting weight on his ankle despite his no weight bearing instructions. (Tr. at 207.) His medial wound was improving, "[h]is anterior and lateral incisions ha[d] healed," and he was re-cautioned about not putting any weight down on his right ankle because it was "already starting to have some failure of fixation." (Tr. at 208.) An x-ray from February 10 showed "no alignment changes, now out of plaster. Distal fibular and anterior tibial tubercle fractures are healing. Plates and screws used for fracture fixation are intact and fully engaged. Medially, the ankle mortise is wide." (Tr. at 207.) Plaintiff was put into a "short leg splint with . . . dressing over his medial wound." (Tr. at 208.)

7

On February 21, 2011, Plaintiff was positive for "headaches, anxiety, depression, and joint pains." (Tr. at 206.) His right ankle was mildly swollen and the incision was healing well; there was a "[s]mall area of granulation tissue noted without associated erythema or discharge." (*Id.*) Plaintiff was to continue his antibiotic treatment and referred to his primary care physician about his elevated blood pressure and headaches. (*Id.*)

An x-ray from February 24, 2011 showed "distal fibula plate and screw fixation and anterolateral tibial plate and screw fixation which appears similar to the previous examination. The distal fibula fracture and distal tibia fractures are unchanged in alignment. These are incompletely united. There is widening of the ankle mortise medially, but this too is unchanged." (Tr. at 204-05.) There was "a large amount of soft tissue swelling present." (*Id.*) On February 24, 2011, Plaintiff's ankle showed "well-healed" incisions and the majority of the wound had healed, "however, there [was] a small 1x2-cm area of granulation tissue present with no erythema or purulence." (*Id.*) Despite his noncompliance in the past, Plaintiff seemed to have complied with his non-weight bearing instructions at this visit. (*Id.*) Dr. Hassan Mir's plan was to apply dressing to Plaintiff's open wound, have Plaintiff follow up weekly with the NIC clinic until the wound healed, and have Plaintiff return in four weeks to repeat the x-rays and, if there was further signs of union to the tibia/fibular space, to allow Plaintiff to start bearing weight. (Tr. at 205.)

On March 24, 2011, Plaintiff's "lateral wound ha[d] completely healed" and his "medial wound ha[d] dried out." (Tr. at 261.) He was switched to dry dressings and there was no sign of deep vein thrombosis. (*Id.*) However, the x-ray showed that, while "there was no indication of hardware failure," the "lateral malleolus ha[d] not united . . . ." (Tr. at 261-62.) Plaintiff

"was given Exogen bone stimulator toe permanent healing in the lateral ankle" and he was to continue on non-weight bearing status. (Tr. at 261.)

On May 19, 2011, Plaintiff's lateral wound had almost completely healed. (Tr. at 259.) Silver nitrate was put on his wound to "close it up." (*Id.*) There was no sign of deep vein thrombosis and his foot and ankle were still swollen. (*Id.*) "[H]e ha[d] 0 "degrees . . . dorsiflexion and 20 degrees of plantarflexion." (*Id.*) He was given a Cam Walker boot and was to begin weight bearing "as tolerated." (*Id.*)

The May 19 x-ray showed "no change in alignment[,] . . . [m]inimal increased callous ha[d] formed in the imaging interval[,] . . . persistent incongruity of the ankle mortise with narrowing of the lateral aspect and widening of the medial aspect[,] . . . [c]onsiderable soft tissue swelling persist[ing] about the ankle[,] [and] [f]eatures of mid foot arthritis . . . ." (Tr. at 260.)

On May 31, 2011, Plaintiff went to the emergency room at Saint Thomas Health Services for leg pain and swelling; he rated the pain as a ten out of ten. (Tr. at 317-327.) He was admitted to the hospital on June 1 for right lower extremity cellulitis, and discharged on June 3. (*Id.*) The x-rays showed "plate fixation of the distal tibia and distal fibula, lucent defect within the distal fibula"; they also "represente[d] bone matrix loss although manifestation of non-healed fracture [was] not excluded"; there was also a "partial imaging of midfoot deformity, [and] osseous demineralization." (Tr. at 318.) Plaintiff was placed on IV antibiotics and fluids. (*Id.*) Upon admission, Plaintiff had "a swollen erythematous right lower extremity." (Tr. at 319.) Plaintiff was seen by Dr. Shell, from orthopedic surgery, who consulted with Dr. Mir from Vanderbilt. (*Id.*) The surgeons agreed that Plaintiff would almost definitely need another surgery—at least for irrigation and debridement, and maybe even to remove the

hardware in his ankle. (*Id.*) He was put on antibiotics and told to follow up with Dr. Mir the next week to schedule surgery. (*Id.*)

On July 7, 2011, Plaintiff was walking with the Cam boot and crutches; his gait was antalgic on the right (Tr. at 258.) He reported "some lateral-sided pain" and was "taking over-the counter medications for pain control." (*Id.*) His incisions were "well-healed" with "no signs or symptoms of infection. Passive range of motion [was] from neutral dorsiflexion and 20 degrees of plantar flexion." (*Id.*) The x-rays showed "that his fibular fracture appear[ed] to be united as well as his distal tibial . . . fracture. He d[id] appear to have persistent widening of his syncesmosis consistent with previous films as well as some mild medial clear space widening, also consistent with previous films." (*Id.*) The hardware was "intact and in good position." (*Id.*) The plan was for Plaintiff to continue to bear weight "as tolerated," and to "wean out of the boot and from the crutches, as he [was] able to." (*Id.*) He was told that if he developed chronic pain and instability he might "eventually require ankle fusion." (*Id.*)

On October 20, 2011, Plaintiff was admitted to Vanderbilt University Medical Center because "his right lower extremity demonstrate[d] a poke hole drainage from the right lateral fibular incision . . . [with] purulent drainage[,] . . . [and] diffuse edema to the mid calf level." (Tr. at 338-51.) The impression from the x-ray was "[h]ealing distal tibia and fibular fractures with no alignment changes with regards to the major osseous fracture components . . . [and] worsening tibiotalar osteoarthritis." (Tr. at 343.) The hardware in Plaintiff's ankle was surgically removed on October 26, 2011. (Tr. at 350.) After this surgery he was to be non-weight bearing on crutches for two weeks. (Tr. at 351.)

On November 10, 2011, Plaintiff followed up at Vanderbilt University Medical Center. "His cultures did show MRSA and he [was] on oral antibiotics for this." (Tr. at 340.)

"Examination of the ankle show[ed] well-healed incisions with no signs or symptoms of infection . . . [and] he [was] able to tolerate gentle range of motion." (*Id.*) The sutures were removed and he was told he could "start ambulating again with either a boot or shoe for support as he [was] able to tolerate." (*Id.*) He was to continue his antibiotics for six weeks. (*Id.*) He was also told that he may ultimately require ankle fusion. (*Id.*) The x-ray showed "no alignment changes since 10/20/2011. Distal fibular and Tillaux fracture fixation plates and screws ha[d] been removed. There [was] no new bone loss or destruction." (*Id.*)

On December 12, 2011, Plaintiff went to Hurley Medical Center complaining of leg pain. (Tr. at 368.) He said he had been taking Lortab for the pain but was out of his prescription. (Tr. at 368.)

On January 20, 2012, Plaintiff went to University of Toledo Medical Center to have his ankle wound evaluated. (Tr. at 413-26.) He complained that over the last seven to fourteen days his right ankle had "become warm, red[,] and increased in its swelling." (*Id.*) He stated that he has "continue[d] to walk on his ankle with his CAM walking boot." (*Id.*) Plaintiff was able to walk without assistance but with difficulty. (*Id.*) Upon examination, Plaintiff's right shin and anterior ankle were tender. (*Id.*) There were areas of erythema and cellulitis in the right shin and right anterior ankle; these parts were also inflamed. (*Id.*) Plaintiff had a normal psychiatric evaluation; his affect and demeanor were appropriate. (*Id.*) Plaintiff had "obvious swelling diffusely," the ankle was noticeably warm, there was no active drainage or obvious induration, there was minimal erythema, and he had "well-healed surgical incisions about his right ankle." (*Id.*) An x-ray showed "a nonunion of the distal fibula as well as tibia." (*Id.*) He had a "normal range of motion about his right knee," a five out of five "strength in his hamstrings and quadriceps," and "[e]xamination of the contralateral extremity was within

11

normal limits." (*Id.*) Joint aspiration was attempted, but no fluid was obtained. (*Id.*) Plaintiff was given intravenous morphine and had "[g]ood pain relief." (*Id.*)

The January 20, 2012 x-rays showed "a nonunion of the distal fibula as well as tibia." (Tr. at 419.) On April 2, 2012, Plaintiff's x-ray showed a chronic bone infection in his right ankle. (Tr. at 411-12.)

On April 2, Plaintiff went to Hurley Medical Center Emergency Room because of extreme leg pain: In the "Patient presents with" section of the intake form, under "Leg Pain," it is noted that "Pt [Patient] states that he has had extreme leg pain in [r]ight leg. Pt was in car accident in December 2010. Pt had screws and bolts removed and since then . . . has had leg pain." (Tr. at 430.) In the comments section it is noted that the screws were removed in November 2011. (Tr. at 431.) The pain was aggravated by bearing weight. (*Id.*) Plaintiff's right ankle "exhibit[ed] decreased range of motion and swelling," no tenderness, and his Achilles tendon was normal. (*Id.*) His right ankle showed no erythema and there were no open wounds. (Tr. at 432.) Plaintiff was prescribed oral antibiotics and Vicodin and left "ambulatory with steady gait with cane." (Tr. at 430, 432, 438.)

On May 6, 2011, Charles S. Settle, M.D., completed a Physical RFC Assessment of Plaintiff. (Tr. at 247-256.) He found that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours in an eight-hour work day, sit with normal breaks for a total of six hours in an eight-hour work day, and was limited in his ability to push or pull in his lower extremities. (Tr. at 248.) He could never climb ladders, ropes, or scaffolds; and could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. (Tr. at 249.) He had no manipulative, visual, communicative, or environmental limitations (Tr. at 250-51.) He noted that Plaintiff's statements about pain and

inability to use right leg were credible, but expected these symptoms to subside with healing and treatment. (Tr. at 254.)

On September 13, 2011, Celia Gulbenk, M.D., completed a Physical RFC Assessment of Plaintiff. (Tr. at 279-88.) She found that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour work day, sit with normal breaks for about six hours in an eight-hour work day, and was limited in his ability to push or pull in his lower extremities. (Tr. at 280.) Plaintiff could occasionally climb ramps or stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, or crawl. (Tr. at 281.) There were no manipulative, visual, communicative, or environmental limitations. (Tr. at 282-83.) Dr. Gulbenk stated that Plaintiff's symptoms were expected to improve by twelve months after the alleged onset. (Tr. at 286.)

On October 3, 2011, Plaintiff saw psychiatrist Randall May, M.D., for a consultative examination. (Tr. at 293-298.) He wore his walking boot and used a cane. (Tr. at 294.) He was appropriately dressed, his hygiene was appropriate, and he was cooperative. (*Id.*) Plaintiff admitted that the December 2010 car accident was a suicide attempt. (Tr. at 295.) He reported having visions of dead people, and experiencing auditory hallucinations. (*Id.*) He did not seem psychotic at the visit. (*Id.*) He admitted to use of cocaine, Xanax, Lortab, and alcohol, although he said he had not used since the December car accident. (*Id.*) Dr. May stated that "he did not seem to be putting forth good effort in the mental status exam." (Tr. at 296.) Dr. May estimated his intelligence as "low average." (*Id.*) His affect was blunted and he "seemed sad." (*Id.*) Plaintiff reported major depressive disorder with psychotic features, but this needed to be confirmed because Plaintiff "did not seem psychotic today." (Tr. at 297.)

Plaintiff was treated at Mental Health Cooperative on July 15, July 27, and August 1, 2011. (Tr. at 266-278.) He was not currently on any medication, was homeless, living with various friends, and had no income or insurance. (*Id.*) He reported "daily mood swings with depression and irritability," problems sleeping, "decreased appetite and energy," problems concentrating, "anhedonia, isolating from others, racing thoughts, feelings of hopelessness," visual hallucination, auditory hallucinations, daily anxiety, "and paranoid thoughts that people are against him." (*Id.*) He said that he had been having these symptoms for the past three to four years. (*Id.*) Plaintiff also reported that his December 2010 car accident was intentional. (*Id.*) He reported that he used to use crack, marijuana, and alcohol, but he has been sober since the car accident. (*Id.*) The impression from the July 15 visit was "bipolar" disorder. (*Id.*) At the July 27 visit Plaintiff reported depression and crying spells. (*Id.*) At the August visit, Plaintiff reported some success in managing his mood, but also reported problems with panic attacks. (*Id.*) He was dressed well, had adequate hygiene, and made good eye contact. (*Id.*) Plaintiff also tested positive for THC. (*Id.*)

Plaintiff was treated at Centerstone Behavioral Health Center from July 26, 2011 to March 27, 2012. (Tr. at 369-410.) He had been referred for treatment of depression. (*Id.*) On August 22, 2011 Plaintiff was diagnosed with schizoaffective disorder and bipolar disorder. (Tr. at 399.)

### 2.     Plaintiff's Function Report

In his February 25, 2011 Adult Function Report, Plaintiff stated that he is unable to use his right leg at all. (Tr. at 154.) His usual day consisted of meditating/worshipping, sitting around watching television, listening to the radio, and eating. (Tr. at 155.) He said his condition affected his sleep because his medicine gave him a headache. (*Id.*) He struggled with

his personal care because he could not put any weight on his right leg; he had to sit down to take care of his hair and shave, he could feed himself but it was difficult to carry food items while on crutches, and he struggled to use the toilet. (*Id.*) He prepared his own breakfasts about twice a week but it took him a long time. (Tr. at 156.) He also had to sit down while cooking. (*Id.*) He did not do any housework or yardwork because he only could use one of his legs. (*Id.*) He reported going outside about six times a week. (Tr. at 157.) When he went out he needed a wheelchair or crutches; he would ride in a car or use public transportation. (*Id.*) He did not drive because he only had the use of one leg. (*Id.*) He said he would sometimes shop in stores for groceries, but it took him four to five hours to do so. (*Id.*) His hobbies used to be basketball and church, but he could not play basketball anymore because of his injury. (Tr. at 158.) He spent some time with friends, usually on the phone, but sometimes in person. (*Id.*) He said he rarely went out except to the hospital and church, and that he needed someone to accompany him. (*Id.*) He indicated his condition affected lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and completing tasks. (Tr. at 159.) He could only walk about fifteen steps without taking a break because he used crutches. (*Id.*) He could pay attention for "[a] while until the pain starts." (*Id.*) He could follow written and spoken instructions "ok." (*Id.*) He got along with authority figures and handled stress and changes in routine "fine." (*Id.*) He was afraid his leg would be amputated if the MRSA in his foot was not cured. (Tr. at 160.) He used crutches, a walker, and a wheelchair and all of them were prescribed by a doctor in "January." (*Id.*) He did not put a checkmark next to the brace/splint box. (*Id.*) He used the wheelchair for long distances, and the crutches and the walker in his house. (*Id.*) He was taking oxycodone, Vancomycin, Lovenox, and Senna Docusate. (Tr. at 161.) Side effects included nausea, dizziness, itching, fatigue, dehydration, and headache. (*Id.*)

Plaintiff concluded, "[I] had surgery on [my] left knee [a] few years back [and] was . . . working up until [the] accident[.] Now it's very difficult living daily [and] being bruised up [and] sore. . . . [M]y chest was injured[,] my body aches daily[,] [there are] no normal activities [I am] able to perform . . . ." (Tr. at 161.)

In his August 2, 2011 Adult Function Report, Plaintiff indicated that he was homeless and living either in a shelter or with friends. (Tr. at 173.) He said that he was unable to sit very long before his "buttocks . . . [became] irritated." (*Id.*) He also said that his memory was bad and he heard voices "telling me life [was] not worth living." (*Id.*) He said that he spent most of his day keeping his leg elevated, sitting in the shade with his dog, reading his bible, praying, and visiting with his friends. (Tr. at 174.) He indicated he was not taking care of anyone or any pets. (*Id.*) The majority of the rest of this report matched his earlier report. He indicated he was using crutches, a walker, a wheelchair, and a brace/splint; and that all of these had been prescribed in "December." (Tr. at 179.) His medicine at this time was Lortab, Depakote, blood pressure medication, cholesterol medication, and a "heart pill." (Tr. at 180.) The side effects were paranoia, "sleep," problems urinating, and dry mouth. (*Id.*)

### 3.  Plaintiff's Testimony at Administrative Hearings

Plaintiff testified that he was not taking any medications for his daily ankle pain because he could not afford his prescriptions. (Tr. at 32.) According to him, his doctors were advising further surgery on his ankle. (*Id.*) He had not had the surgery yet because he was uninsured. (Tr.at 36.) He was unable to do any cooking or housework at home. (Tr. at 32.) He did not go outside very often, and he usually spent his day reading his bible, praying, meditating, and watching television. (Tr. at 33-34.) He could sit for about thirty minutes to an hour at a time before his back and legs began hurting. (Tr. at 34.) He would also have to elevate his right leg

if he sat much longer than twenty minutes straight. (*Id.*) He could walk for only twenty or thirty feet. (*Id.*) He could only stand in place for ten to fifteen minutes. (*Id.*) He had swelling in his right ankle and leg every day and spent eight to twelve hours a day with it elevated above his heart. (Tr. at 35.) He was using a cane at the hearing. (*Id.*) He also wore a boot on his right foot. (*Id.*) He testified that he had been using the cane and the boot since the car accident. (*Id.*) He used a shower chair because it would be difficult to stand up for the duration of the shower. (Tr. at 35-36.)

Plaintiff also testified that besides his ankle impairments, he had mental issues which caused him to "hear voices" and interfered with his ability to sleep. (Tr. at 32-33.) He took Seroquel and Cymbalta for his psychological symptoms. (Tr. at 33.) He stated that he had intentionally caused the car accident because he "didn't want to live anymore." (Tr. at 36.) He had not used any non-prescribed or illegal drugs or alcohol since the accident. (Tr. at 37.)

### 4.    Vocational Expert Testimony at Administrative Hearing

The ALJ asked the Vocational Expert ("VE") a series of hypothetical questions, all based on an individual with the same age, education, and work experience as Plaintiff. (Tr. 37-41.) All of the VE's testimony was consistent with the Dictionary of Occupational Titles. (Tr. at 40.) The VE defined the region as the lower peninsula of Michigan. (Tr. at 38.) The first hypothetical individual was

> was able to perform light work, . . . limited to occasional pushing or pulling with his right lower extremity, . . . can only occasionally climb, balance, stoop, crouch, kneel[,] or crawl. He has psychological symptoms that limit him to unskilled work, as defined by the regulations, and work that has only occasional changes in the work setting that involves no interaction with the general public and only occasional interaction with coworkers.

(Tr. at 38-39.) The VE testified the hypothetical individual would be able to perform bench assembler positions (approximately 1000 regionally), inspection positions (approximately 1500 regionally), and sorter positions (approximately 1000 regionally) (Tr. at 39.)

Next, the ALJ asked about the effect of lowering the exertional level to sedentary. (*Id.*) The VE testified that there would be inspection positions (approximately 1000), sorter positions (approximately 500), and document addresser positions (approximately 200). (*Id.*)

The ALJ then added the following limitation: "[D]ue to a combination of his medical conditions, associated pain, and psychological symptoms[,] this person is unable to engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week for a 40-hour work week or an equivalent work schedule." (Tr. at 39-40.) The VE testified that this additional limitation would preclude work. (Tr. at 40.)

Plaintiff's attorney asked the VE whether the hypothetical individual would be precluded from work if he had to elevate his lower right extremity for at least two hours out of an eight-hour work day. (Tr. at 40.) The VE testified that this would be work preclusive. (*Id.*) Plaintiff's attorney also asked whether "independent of the need to elevate, a hypothetical individual, due to severe mental impairments, who would be off task at least 15% of an eight-hour workday" would be employable. (*Id.*) The VE testified that this limitation would also preclude work. (*Id.*)

### F.   Governing Law and Analysis

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42

U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006);

*Mullen*, 800 F.2d at 545.

### 1.     Legal Standard

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed

the RFC

> to perform sedentary work as defined in 20 CFR 404.1567 (a) and 416.967
> (a) except the claimant is limited to occasional foot control operation with
> his right lower extremity, and he can only occasionally climb, balance,
> stoop, crouch, kneel[,] or crawl. He is limited to unskilled work as defined
> by the regulations, in work that has only occasional changes in the work
> setting, that has no contact with the general public, and has only occasional
> interaction with co-workers.

(Tr. at 15.) Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or
> carrying articles like docket files, ledgers, and small tools. Although a
> sedentary job is defined as one which involves sitting, a certain amount of
> walking and standing is often necessary in carrying out job duties. Jobs are
> sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.

20 C.F.R. § 404.1567(a).

After review of the record, I suggest that the ALJ utilized the proper legal standard in

his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn

next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.     Substantial Evidence

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the

case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d

at 509; *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must

consider the evidence in the record as a whole, including any evidence that might subtract from

the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*,

974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247; *see also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and

credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

### a. Substantial Evidence Supported ALJ's Step Two Analysis

Plaintiff contends that because the only physical impairment the ALJ found to be severe was the cellulitis in Plaintiff's right ankle, the ALJ therefore failed to assess the severity of his "unhealed fracture and the degenerative arthritis of that ankle." (Doc. 9 at 9.) He contends that the ALJ carried this error "throughout the entire Sequential Evaluation Process by overlooking [Plaintiff's] most important impairment." (*Id.*) I suggest that any alleged omission from the list of severe impairments does not undermine the ALJ's decision. This is because once Step Two is "cleared" by a finding that any severe impairment exists, the ALJ must consider a plaintiff's "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). "The fact that some of [the plaintiff's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id.*

### b. Substantial Evidence Supported ALJ's Step Three Analysis

Next, Plaintiff specifically argues that the ALJ should have evaluated Plaintiff's orthopedic condition under Listing 1.02 at Step Three. (Doc. 9 at 9-11.) He contends that "[t]here are many elements of the Listing under 1.02 such as instability, chronic joint pain, and

x-ray findings of joint space narrowing or bony destruction, which appear to be present . . . ."

(*Id.* at 11.)

Claimants with severe impairments that meet or equal a listing in the Appendix and that meet the duration requirement are deemed disabled without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). The duration requirement is that, unless resulting in death, the severe impairment "must have lasted or must be expected to last for a *continuous* period of at least 12 months." 20 C.F.R. § 404.1509 (emphasis added). Fitting a claimant into a listing is dispositive and thus demands a higher level of proof: listed impairments preclude any gainful activity, not just substantial gainful activity. *See Zebley*, 493 U.S. 521, 525 (1990); 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id*; *see also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). Alternatively, medical equivalence to a Listing can occur in three situations where the claimant fails to meet all of the criteria:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 n.2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526).

An ALJ retains discretion at this stage, and does not need to attach "any special significance to the source of a[] [medical] opinion . . . [regarding] whether an impairment

22

meets or equals a listing." 20 C.F.R. § 404.1527(d)(3). This is particularly true for the first part of the analysis: "'[A]n ALJ is capable of reviewing records to determine whether a claimant's ailments meet the Listings . . . .'" *Stratton v. Astrue*, 987 F. Supp.2d 135, 148 (D. N.H. 2012) (quoting *Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D. Tex. May 23, 2008)). The Commissioner, however, has qualified the ALJ's discretion to decide equivalence, noting that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the [ALJ] or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3.

An ALJ that fails to undertake a detailed Step Three analysis has erred; further, the error is not harmless because the claimant might be presumed disabled with no need of any functional analysis at steps four and five. *Reynolds*, 424 F. App'x. at 416. The rule that an ALJ "evaluate the evidence," compare it to the Listing, and "give an explained conclusion" is "prudential and not jurisdictional"–it is impossible to determine whether substantial evidence supports an ALJ's determination without this analysis. *Id.* And because the requirement is prudential a Plaintiff cannot waive this argument by not raising it. *Id.*

An ALJ is not, however, required to consider every Listing or to consider Listings that claimants "clearly do[] not meet." *Sheeks v. Commissioner of Social Security Administration*, 544 F. App'x 639, 641 (6th Cir. 2013). The ALJ's Step Three explanation is held to the same standard as the rest of the decision, and the ALJ does not need to "spell[] out every consideration that went into the step three determination" or recount every fact discussed elsewhere in the decision. *Bledsoe v. Barnhart*, 165 F. A'ppx 408, 411 (6th Cir. 2006); *see also Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (noting that the ALJ does not need "to use

particular language or adhere to a particular format in conducting his analysis"). If the necessary Step Three analysis appears elsewhere in the ALJ's decision, a court may find that it was also considered by the ALJ at Step Three even if it is not duplicated there. *See White v. Colvin*, No. 4:12-cv-11600, 2013 WL 5212629, *7 (E.D. Mich. Sept. 16, 2013) (finding Step Three analysis sufficient because the ALJ "described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings").

Because the burden at Step Three, both for meeting and medically equaling a listing, falls on the claimant, the ALJ's analysis at this step must always be viewed in light of the evidence presented by the claimant. Thus, the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing. *See, e.g.*, *Sheeks*, 544 F. App'x at 641 ("[T]he ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ."); *Ballardo v. Barnhart*, 68 F. App'x 337, 339 (3d Cir. 2003) (finding that a conclusory, single-sentence analysis was adequate where the claimant "presented essentially no medical evidence of a severe impairment"). Likewise, in *Retka v. Commissioner of Social Security*, the Sixth Circuit noted the need for expert opinions on the question of equivalence, but quickly shifted the focus to the "claimant's burden . . . to bring forth evidence to establish that he or she meets or equals a listed impairment." 70 F.3d 1272, 1995 WL 697215, at *2 (unpublished table decision) ("The absence in the record of medical evidence showing significant neurological deficits and muscle atrophy supports the ALJ's conclusion . . . . [And] [t]hus, there is no merit to the plaintiff's argument that the ALJ erred in failing to find his condition equivalent to the Listing . . . ."). In that case, the ALJ had scoured the record, found that the plaintiff had produced no evidence supporting disabling pain, and thus the Court rejected the attack on the decision. *Id.*

24

I suggest that in this case, Plaintiff has failed to meet his burden at Step Three, both for meeting or equaling Listing 1.02. A claimant with the following meets Listing 1.02:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Part 404, subpart P, Appendix 1 § 1.02. In this case Plaintiff clearly does not meet the 1.02B criterion. Therefore, his burden is to show, among other things, an inability to ambulate effectively,[2] chronic joint pain, and limited/abnormal motion. *Id.*; 20 C.F.R. § 404.1509. Further, all of these had to meet the durational requirement. 20 C.F.R. § 404.1509.

In this case, the ALJ only considered Plaintiff's mental impairments at Step Three. (Tr. at 13-15.) However, at Step Four the ALJ found that Plaintiff failed to meet the durational requirement. The ALJ reasoned that Plaintiff had "no impairment of his mobility and he [was] able to ambulate with a steady gait using a cane," (Tr. at 18 (citing Tr. at 430)), and that "[w]hile the condition arose from an intentional motor vehicle accident on the alleged onset

---

[2] "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(B)(2)(b). An individual meets this condition when, for example, they need two crutches or canes, cannot walk without a walker, cannot travel alone, cannot use public transportation, or cannot walk. *Id.*

date, the claimant reported that he has had subjective complaints of severe pain only since the hardware removal surgery in November 2011." (Tr. at 18.) I suggest that substantial evidence supports the ALJ's finding that Plaintiff failed to meet the durational requirement. The ALJ's finding is consistent with and supported by the record. For example, on January 20, 2012, Plaintiff was able to walk "on his ankle with his CAM walking boot." (Tr. at 418.) He was walking unassisted with difficulty. (*Id.*) This seems to indicate he was not even using a cane, just the boot. In fact, nowhere in the record of his January 20, 2012 visit to the University of Toledo Medical Center is it indicated that he was using a cane or crutches. (Tr. at 413-26.)

I suggest that because an ALJ is "not required to consider every listing or to consider Listings that claimants "clearly d[] not meet," *see Sheeks*, 554 F. App'x at 641, and because Plaintiff clearly does not meet the durational or the inability to ambulate effectively requirements of Listing 1.02, the ALJ's cursory analysis of Plaintiff's physical impairments at Step Three was supported by substantial evidence.

### c.   *RFC was Supported by Substantial Evidence*

Plaintiff also argues that his need to elevate his leg for eight to twelve hours a day is reasonable "given a severely fractured ankle with subsequent infection that developed into chronic nonhealing with bone loss and arthritis." (Doc. 9 at 12-13.) He contends that the ALJ did not properly factor Plaintiff's "non exertional impairment of the necessity to elevate his right leg" into the hypothetical and RFC. (*Id.*) He likewise argues that the ALJ did not properly incorporate his reliance on a cane into the RFC. (*Id.* at 13-15.) He notes that the VE was not asked whether his answers would be different if the hypothetical individual relied on a cane. (*Id.* at 14.)

26

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [the plaintiff's] individual physical and mental impairments.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

Plaintiff stated at the administrative hearing that he spent eight to twelve hours a day with his leg elevated above his heart. (Tr. at 35.) He was using a cane at the hearing and testified that he continued to use it to ambulate. (*Id.*) Defendant argues that "Plaintiff cites no medical records that support his contention that he must elevate his legs and use a cane to ambulate apart from his own subjective allegations." (Doc. 13 at 16.)

I suggest that Plaintiff has failed to show that his RFC includes the need to elevate his leg. Plaintiff does not cite to any medical records to support this. Further, nothing in the record shows that Plaintiff was ever told to keep his leg elevated. Therefore, I suggest that Plaintiff failed to show that this limitation should have been included in his RFC.

Likewise, I suggest that Plaintiff has not shown that his RFC includes the need to use a cane. Plaintiff was only ever prescribed a cane for short-term recovery use, and nothing in the record shows that he presently requires a cane. *See* 20 C.F.R. § 404.1545(a)(2). The only time that the record supports Plaintiff's need for a cane was when he was recovering from surgery and on non-weight bearing status, and when he was weaning off of the boot and the cane. (Tr. at 205, 207, 210, 227, 258, 261.) The hardware was removed from Plaintiff's ankle on October 26, 2011, and he was only required to be non-weight bearing on crutches for two weeks. (Tr. at 351.)

The ALJ found that "[t]he record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." (Tr. at 16.) He gave the state agency medical consultant opinions of Dr. Settle and Dr. Gulbank little weight because they were made after reviewing the medical records and did not actually examine Plaintiff; the ALJ nonetheless reduced Plaintiff's RFC to be in conformance with these opinions. (Tr. at 17); *see also* 20 C.F.R. §§ 1527 (c)(1) ("Generally, we give more weight to the opinion of a source who has examined you . . . ."); 20 C.F.R. §§ 1527(e)(2)(ii)  ("When an [ALJ] considers findings of a State agency medical . . . consultant . . . the [ALJ] will evaluate the findings using the relevant factors in [20 C.F.R. §§ 1527 (a)-(d)].")

I suggest these opinions, that Plaintiff's inability to use his right leg was transitory and was expected to improve within twelve months, (Tr. at 254, 286), are supported by the record. For example, a month after the surgery to remove the hardware from Plaintiff's ankle, on November 10, 2011, Plaintiff was told he could "start ambulating again with either a boot or shoe for support as he [was] able to tolerate." (Tr. at 340.) At the same time he was also told he

might eventually need ankle fusion surgery. (*Id.*) This indicates that the surgeon was optimistic that Plaintiff would be able to ambulate without assistance despite the potential need for surgery in the future. Additionally, it appears that Plaintiff had been ambulating without the assistance of a cane for a period surrounding his January 20, 2011 visit to University of Toledo Medical Center because there is no evidence he was using a cane and he reported that he "continue[d] to walk on his ankle with his CAM walking boot." (Tr. at 418). *But See* (Tr. 430) ("[Plaintiff] left ambulatory with steady gait with cane.").

For these reasons I suggest that the ALJ's RFC and the hypothetical posed to the VE were supported by substantial evidence. The ALJ did not need to include in the hypothetical or Plaintiff's RFC a need to elevate his right leg, or a reliance on a cane to ambulate.

### G.      Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.

*Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 27, 2015                        /S PATRICIA T. MORRIS
                                              Patricia T. Morris
                                              United States Magistrate Judge